UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:18-cr-00192-JAW |
| | ) | |
| RICHARD BEAUREGARD | ) | |

**ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

The Court denies a defendant's motion to suppress evidence, finding that the police stop of his rented Kia was justified either by the defendant's traffic infractions witnessed by the state trooper or based on cumulative specific and articulable facts that the defendant was engaged in the transportation of illegal drugs. Based on the record evidence, the Court finds that the defendant voluntarily consented to the search of the Kia and that his initial statements to law enforcement were non-custodial and not subject to *Miranda* warnings. Finding no Fourth Amendment violation, the Court also rejects the defendant's claim that the results of a later search of the Kia consented to by the owner, namely the rental company, should be suppressed as the fruit of the poisonous tree, because the Court concludes the tree was not poisonous to begin with. Finally, the Court rejects the defendant's claim that under *Byrd v. United States*, 138 S. Ct. 1518 (2018), he has a Fourth Amendment interest in the contents of his girlfriend's automobile that was separately stopped.

## I. PROCEDURAL BACKGROUND

On December 17, 2018, a federal grand jury indicted Richard Beauregard, alleging that he committed two federal crimes on November 7, 2018: Count One

alleged that he conspired with others to distribute fentanyl and Count Two that he possessed fentanyl with the intent to distribute it, each a violation of 21 U.S.C. § 841(a)(1). *Indictment* (ECF No. 1). On February 28, 2019, Mr. Beauregard filed a motion to suppress evidence, alleging that law enforcement did not have a reasonable suspicion to stop the vehicle Mr. Beauregard was operating. *Mr. Beauregard's Mot. to Suppress and Dismiss* (ECF No. 34) (*Def.'s Mot.*).[1] On April 8, 2019, the Government filed its opposition to the motion to suppress. *Gov't's Resp. in Opp'n to Def.'s Mot. to Suppress* (ECF No. 41) (*Gov't's Opp'n*). On May 7, 2019, the Court issued notice of an evidentiary hearing on the motion to suppress, setting the hearing for May 29, 2019. *Notice of Hr'g* (ECF No. 42). The Court held the evidentiary hearing on May 29, 2019. *Min. Entry* (ECF No. 43). At the close of the evidence, the parties argued orally and submitted the motion to the Court for ruling.

## II.    POSITIONS OF THE PARTIES

### A.      The Defendant's Motion

In his motion, Mr. Beauregard argues that law enforcement was without reasonable articulable suspicion to stop the vehicle he was operating on November 7, 2018. *Def.'s Mot.* at 1. He maintains that his prolonged detention at the traffic stop was illegal and that he did not voluntarily consent to a search of the vehicle. *Id.* He says that the canine sniff search lacked probable cause, that the canine was not

---

[1]      Although the motion is entitled both as a motion to suppress and a motion to dismiss, the Defendant does not argue in his memorandum that the case should be dismissed, only that the evidence should be suppressed. *Def.'s Mot.* at 1-23. The Court treated the motion as solely a motion to suppress evidence.

properly handled or trained,[2] and that the further search lacked probable cause. *Id.* He argues that law enforcement obtained any statements in violation of *Miranda v. Arizona*, and his statements should be suppressed. 384 U.S. 436 (1966). *Id.*

## B. The Government's Response

The Government points out that law enforcement stopped two vehicles on November 7, 2018 in the breakdown lane of the Maine Turnpike. *Gov't's Opp'n* at 1-6. Mr. Beauregard was operating the first vehicle that the police stopped: a blue Kia bearing New Hampshire license plates. *Id.* at 3-4. The second vehicle was a 2002 Dodge Caravan bearing Maine license plates, operated by Megan Shockley. *Id.* at 6. The Government argues that Mr. Beauregard does not have standing to challenge the stop and search of the Caravan owned by Ms. Shockley. Further, the Government contends that the police stop and the search of the Caravan were legal because Ms. Shockley had an outstanding arrest warrant, she admitted that she was carrying contraband on her person, and she produced a small quantity of heroin and cocaine as well as a hypodermic needle. *Id.* at 7. After a canine alerted to the odor of a controlled substance in the Caravan, a trooper searched the Caravan and found heroin (approximately 210 grams) in a pair of pants and crack cocaine (approximately 15 grams) in a sock. *Id.* at 6-7. The Government says that Mr. Beauregard has no

---

[2]    The Court has not addressed in any detail whether the canine was properly trained and handled. Trooper Adam Schmidt testified that he and Ibo are certified as a team, that they went to narcotics school in October 2015, that Ibo is trained to alert to crack, methamphetamine and heroin, and that they undergo a yearly certification as a team. Ibo alerted to the driver's side door of the Caravan, where a small amount of crack was found, and to the rear of the Caravan where heroin and crack cocaine was located. Ibo therefore alerted to the types of drugs that he is trained to discover. Based on the evidence in the record, the Court finds no basis to challenge Ibo's training and handling.

standing to object to the search of Ms. Shockley's vehicle and that the search of the Shockley vehicle was lawful. *Id.* at 7-10.

The Government also says that the stop and search of the Kia was lawful. *Id.* at 10-14. It further claims that Mr. Beauregard consented to the search of the Kia. *Id.* at 14-16. The Government says that the length of time Mr. Beauregard was detained was not unreasonable in the circumstances. *Id.* at 16-17. Finally, the Government argues that Mr. Beauregard's detention was non-custodial and therefore his statements are not precluded under *Miranda*. *Id.* at 17-19.

## III.    DISCUSSION

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. am. IV. The question presented by Mr. Beauregard's motion to suppress is whether law enforcement violated the Fourth Amendment guarantee in its stop and search of Megan Shockley's Dodge Caravan and of the rented Kia that Mr. Beauregard had been operating on November 7, 2018.

### A.    The Stop and Search of Megan Shockley's Dodge Caravan

There is no evidence in this record that the police stop and search of the Shockley Dodge Caravan was illegal. Setting aside the events in Massachusetts, at the May 29, 2019 suppression hearing, Trooper Matthew Williams confirmed that before he stopped Ms. Shockley's Dodge Caravan, he determined that there was an outstanding active arrest warrant for Megan Shockley for a pending Maine State

charge of Aggravated Trafficking in Scheduled Drugs. He was able to visually identify Ms. Shockley as the same person for whom there was an arrest warrant by comparing a Department of Motor Vehicle identification photograph with the driver of the Caravan.

Once he stopped the Shockley Caravan, he asked Ms. Shockley whether she was, in fact, Megan Shockley and she confirmed she was. He placed her in handcuffs. Upon questioning, she volunteered to Trooper Williams that she had a ticket of heroin as well as a small amount of crack and a needle in her bra. Trooper Williams understood that a ticket of heroin referred to a single dose. At that point, Trooper Williams had not searched Ms. Shockley because he was waiting for a female officer to arrive at the scene to perform a search. However, Ms. Shockley told Trooper Williams that if he placed the handcuffs so that her arms were in front, rather than behind her, she would retrieve the drugs and needle. He did so. She voluntarily produced a small amount of heroin and crack cocaine as well as a hypodermic needle from her bra and handed these items to Trooper Williams.

After this occurred, Trooper Adam Schmidt, a Corporal with Troop A of the Maine State Police, trained with Ibo, a canine, and certified as a team, performed a canine search of the Shockley Caravan. According to Trooper Schmidt, Ibo alerted twice to the Caravan. The first was at the driver's door and the second at the rear of the motor vehicle. Based on these alerts, law enforcement opened the back of the Caravan and searched the rear area, where they found a lump inside a cargo pocket of a pair of pants and what looked like heroin inside a plastic bag, itself inside a tube

sock.  They also found a small make-up kit that contained a small amount of crack cocaine under the front driver's seat.

Mr. Beauregard points to certain facts which he claims make the search of the Caravan illegal.  First, he notes that Trooper Schmidt admitted he did not ask Mr. Beauregard's permission to search the Shockley caravan.  Next, he points out that when Mr. Beauregard asked Trooper Schmidt whether the car the police had stopped just ahead of his Kia was his girlfriend's vehicle, Trooper Schmidt said, "No, I don't think so."  Mr. Beauregard argues that Trooper Schmidt was lying to him when he denied that they had stopped Ms. Shockley's Caravan.  Third, he maintains that if Mr. Beauregard had known it was Ms. Shockley's vehicle stopped ahead, he would have walked up and checked on her.

But none of these points matters if Mr. Beauregard has no Fourth Amendment rights in Ms. Shockley's Caravan or the items of personal property searched and seized inside her Caravan.[3]  Fourth Amendment rights are "personal to each defendant" and may not be asserted vicariously.  *United States v. Lopez-Lopez*, 282 F.3d 1, 9 n.3 (1st Cir. 2002) (citing *United States v. Padilla*, 508 U.S. 77, 81-82 (1993) (per curiam)); *United States v. Lopez-Lopez*, 282 F.3d 1, 9 n.3 (1st Cir. 2005).  In *Padilla*, the United States Supreme Court wrote that "[i]t has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights

---

[3]    In *United States v. Bucci*, 582 F.3d 108 (1st Cir. 2009), the First Circuit pointed out that even though courts often refer to this issue as one of standing, "it is more appropriately treated as a substantive Fourth Amendment legal question."  *Id*. at 116 n.5 (citing *United States v. Rheault*, 561 F.3d 55, 58 n.8 (1st Cir. 2009)); *see Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018).

were violated by the challenged search or seizure." *Padilla*, 508 U.S. at 81 (emphasis in original).

The familiar standard for assessing whether a defendant has a Fourth Amendment interest in property searched or seized is "first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable." *United States v. Rheault*, 561 F.3d 55, 59 (1st Cir. 2009) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). Regarding Fourth Amendment interests in automobiles, the First Circuit has written that "[i]n the context of a vehicle search, a defendant must show a property or a possessory interest in the automobile in order to establish a reasonable expectation of privacy." *United States v. Almeida*, 748 F.3d 41, 47 (1st Cir. 2014). A person who is "merely a passenger" does not have a reasonable expectation of privacy in a vehicle. *Id.*

The record reveals that the Caravan was Ms. Shockley's, not Mr. Beauregard's, and that law enforcement had the right to stop and arrest her once it confirmed that she was someone with an outstanding arrest warrant. Having legally stopped and arrested Ms. Shockley, once she produced drugs and a hypodermic needle from her clothes and once Ibo alerted on the Caravan, the police had the right to search the Shockley Caravan.

Mr. Beauregard's response is that he has standing to challenge the search of the Caravan because at least one item of personal property inside the Caravan was not Ms. Shockley's. Mr. Beauregard maintains that once the police came upon a pair

of men's pants inside the Caravan, they must have known that the pants were not hers and that they must have known they were searching someone else's property. As a preliminary matter, even if this premise were correct (which the Court does not find), to establish standing to contest the search of items of personal property in Ms. Shockley's motor vehicle, Mr. Beauregard would have to assert actual ownership in the pair of pants and the tube sock where the police found drugs. There is no evidence that Mr. Beauregard has ever claimed that the pair of pants and the tube sock were in fact his. Nor in the circumstances of this case would the Court expect that Mr. Beauregard would freely admit that the pants and sock containing illegal drugs were his.

Moreover, there is nothing to suggest that the tube sock was a "male" or "female" sock, so the notion that the police should have known that the sock was not Ms. Shockley's is a reach. Even if the pair of pants were traditionally "male," there is nothing in the record to suggest that Ms. Shockley might not have worn them. There is no prohibition preventing women from wearing traditionally male clothing. On this record, there is no evidence that the pants were of a size that would prevent Ms. Shockley from fitting into them. Moreover, even if the male character of the pants could possibly establish that the pants were not Ms. Shockley's, it is a giant leap to conclude that they must have been Mr. Beauregard's. The Court is aware of no authority that gives a male a Fourth Amendment right to contest the search of all male-styled clothing that the police find in another vehicle.

In fact, the First Circuit has refused to extend the privacy interest in a vehicle to non-owners who were driving the vehicle with the owner's permission, unless their use exceeds "a casual possession" of the vehicle. *Almeida*, 748 F.3d at 48; *United States v. Sanchez*, 943 F.2d 110 (1st Cir. 1991); *United States v. Lochan*, 674 F.2d 960 (1st Cir. 1982). An absence of privacy interest in the vehicle extends to an inventory search. *Almeida*, 748 F.3d at 48 ("[W]e conclude that Almeida has failed to meet his burden of proof establishing that he had a reasonable expectation of privacy in the truck. Thus, he cannot bring a challenge under the Fourth Amendment to the evidence recovered from the truck, either in the course of Drouin's warrantless search or the subsequent inventory"). If a driver and passenger in a non-owned vehicle may not, absent unusual circumstances, claim a Fourth Amendment right to the vehicle and its contents, Mr. Beauregard's claim that he had a Fourth Amendment interest in a vehicle he did not own and did not occupy, either as a passenger or an operator, extends Fourth Amendment jurisprudence beyond the breaking point.

Despite this imposing array of countervailing authority and a difficult factual predicate, Mr. Beauregard posits the case of *Byrd v. United States*, 138 S. Ct. 1518 (2018) as supporting his position that he enjoyed a Fourth Amendment interest in Ms. Shockley's Dodge Caravan and its contents. In *Byrd*, Terrence Byrd and Latasha Byrd drove in Mr. Byrd's Honda to a Budget car rental facility, where Latasha Byrd rented a Ford Fusion, listing herself, not Mr. Byrd, as the only authorized driver. *Id.* at 1524. Upon leaving the Budget facility, Ms. Byrd handed over the keys to Mr. Byrd, who put his personal belongings in the trunk and drove off in the rented Ford

Fusion, while Ms. Byrd drove his Honda. *Id.* About three hours later, a state trooper spotted Mr. Byrd driving the Fusion and stopped him for a traffic infraction. *Id.* After discovering that Mr. Byrd was not a listed driver or renter on the car rental agreement, the police concluded he had no reasonable expectation of privacy in the Ford Fusion and its contents. *Id.* at 1525. Inside the car trunk, they found a laundry bag containing body armor and forty-nine bricks of heroin. *Id.*

To address whether the police had the right to perform a warrantless search of the Ford Fusion, the United States Supreme Court posed the following question:

> Does a driver of a rental car have a reasonable expectation of privacy in the car when he or she is not listed as an authorized driver on the rental agreement?

*Id.* at 1527. The *Byrd* Court concluded that "the mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy." *Id.* at 1531.

The obvious critical difference between *Byrd* and Mr. Beauregard's case is that Mr. Byrd was deemed to have Fourth Amendment rights in a vehicle he was operating; Mr. Beauregard is seeking to suppress the results of a search of a vehicle and its contents when he was not the owner, operator or passenger of that vehicle. Even if *Byrd* could apply to Mr. Beauregard's reasonable expectations of privacy in the Kia he had rented and was operating, *Byrd* does not, in this Court's view, create a reasonable expectation of privacy in a vehicle that Mr. Beauregard does not own, had not rented, was not operating and in which he was not a passenger. The Court turns to the stop and search of the Kia.

### B.     The Stop and Search of Rented Kia

#### 1.     The Facts

To describe the backdrop of the stop and search of Mr. Beauregard's rented Kia, the Court starts with events earlier in the day on November 7, 2018 in Lawrence, Massachusetts.  Sergeant Steven Galbadis, a special agent with the United States Drug Enforcement Agency, testified that he had surveilled the activities of a male and a female on November 7, 2018 who were in a blue Dodge Caravan on South Broadway in Lawrence, Massachusetts.  By the Maine license plate, he was able to determine not only that Megan Shockley was the owner of the Caravan, but that she had an outstanding active arrest warrant in Maine.  Sergeant Galbadis was able to confirm the identity of the female in the Caravan in Lawrence as Megan Shockley by comparing his visual identification against a photograph in Maine state records. Sergeant Galbadis testified that Lawrence is known to be a "service city" for illegal drugs being shipped to Maine.

Sergeant Galbadis began surveillance of the male and the person he had preliminarily identified as Megan Shockley.  The male and Ms. Shockley made several stops at stores and then entered onto I-495, only to quickly exit, activities Sergeant Galbadis thought were consistent with efforts to avoid surveillance. Specifically, they went to a Chinese restaurant, where they stayed for thirty to forty minutes, then to a Dollar Tree parking lot, which they entered and immediately left, and then to a Cumberland Farms store, where Ms. Shockley pumped gas while the male entered the store.  Sergeant Galbadis conceded that neither Ms. Shockley nor

the male met anyone during this interval.  He also said that the quick entry and exit from I-495 could have been an attempt to evade surveillance or to detect whether they were being tailed.

The male and Ms. Shockley proceeded to Enterprise Car Rental in the Caravan, left, then returned and left again.  The male entered Enterprise and appeared to rent a blue Kia motor vehicle.  The male got into the Kia and headed off with the blue Caravan following closely behind.  The two vehicles headed north to I-95 in New Hampshire and ultimately reached the state of Maine, traveling northward on the Maine Turnpike.  Sergeant Galbadis observed the two vehicles traveling in tandem with a lead car and a trail car.  For example, when one vehicle changed lanes, the other would do so as well, and the Caravan followed closely behind the Kia. Sergeant Galbadis expressed the view that the operation of these motor vehicles in tandem is a common tactic for drug trafficking organizations.  Sergeant Galbadis alerted the Maine State Police, and troopers were ready for the Caravan and the Kia as they entered the state of Maine.

Trooper Jeremy Forbes of the Maine State Police was operating an unmarked state cruiser when he received word from Sergeant Galbadis that two motor vehicles had entered the state of Maine on the Maine Turnpike and that the operators of the vehicles were suspected of drug trafficking.  Sergeant Galbadis identified the driver of the Dodge Caravan as Megan Shockley, but he did not know the identity of the male driving the Kia.

When he initially spoke to Corporal Schmidt and Trooper Williams, Trooper Forbes was at about mile marker three. He made contact with the Kia at mile marker five. When the Kia reached the Maine Turnpike toll plaza, Trooper Forbes noticed that the Kia seemed to weave, but he was not certain. However, he was able to observe the Kia follow too closely behind another motor vehicle. He then observed the Kia weave twice with the left tire over the lane markers and one additional time.

Trooper Forbes put on the cruiser's blue lights and the Kia pulled into the breakdown lane. Trooper Forbes did not know the identity of the male operator at that point and asked for identification. As Mr. Beauregard reached into his pocket to retrieve his identification, he produced a wad of cash that he later said was about $1,000. Trooper Forbes asked Mr. Beauregard where he obtained the cash and Mr. Beauregard said that he had been working at a construction job in Auburn, Maine, but he could provide no details. Mr. Beauregard later said that he was on disability but was working about twenty hours per week. He described his work as dabbling.

Trooper Forbes asked the male why he was weaving, and Mr. Beauregard replied that he was not aware that he had been weaving. The Trooper asked Mr. Beauregard for the paperwork for the Kia rental. Mr. Beauregard was unable to produce it. Mr. Beauregard said that he thought the paperwork might be in his girlfriend's car. Trooper Forbes did not think there was anything particularly noteworthy about Mr. Beauregard's demeanor, but Trooper Adam Schmidt, who assisted with the stop, recalled that Mr. Beauregard was shaking and developing a

sweat-line in his brow, despite it being about 40 degrees outside. Mr. Beauregard consented to a pat down, which produced nothing of interest.

Mr. Beauregard gave consent to the officers to search the Kia for the rental paperwork. The Troopers asked him whether the Kia was stolen, and Mr. Beauregard denied that it was. Mr. Beauregard gave the officer permission to look in the center console for the paperwork and the officer discovered a crack pipe in the console. Initially, Mr. Beauregard denied that the crack pipe was his, but he later acknowledged it was. Once the officers found the crack pipe, they did not detain Mr. Beauregard because of the pipe. They asked him whether he is an addict, and Mr. Beauregard replied that he used to be, but that he is a recovering drug addict.

Mr. Beauregard thought the rental agreement might be on his phone and he began to scroll through his messages on his cellphone in the presence of Trooper Schmidt, who was able to read that he received a text saying: "Ur swerving and doing 80." *Gov't's Ex.* 4. There was also a message, "Xit 86 sabatis Lisbon." *Id.*

During this time, the officers had not placed Mr. Beauregard under arrest. After the officers discovered the heroin and crack cocaine in the Shockley Caravan, they placed Mr. Beauregard under arrest. The officers had the Kia removed to a parking lot for pickup by Enterprise. On November 29, 2018, Enterprise contacted Detective Clifford of the town of York Police Department and informed him that when they cleaned the Kia, they found a Massachusetts identification, a glass pipe, and what looked like crack on one of the floorboards. Detective Clifford then proceeded

to the Enterprise lot, where he searched the Kia. He found 5.3 grams of fentanyl and 5.3 grams of crack cocaine in the Kia.

### 2. The Issues

In his motion to suppress, as the Court understands it, Mr. Beauregard has raised five major issues regarding the search and seizure of the Kia: 1) whether the traffic infractions in this case justified the traffic stop; 2) whether he consented to the search of the Kia; 3) whether there was otherwise a reasonable suspicion that he was engaged in drug trafficking; 4) whether the length of his detention was reasonable; and 5) whether he was subjected to a custodial interrogation without being provided a *Miranda* warning.

### a. The Traffic Stop of the Kia

In *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), the United States Supreme Court concluded that a police officer may lawfully make a traffic stop if the officer has probable cause to believe that the operator committed a crime. *Id.* at 323. In fact, the *Atwater* Court concluded that the Fourth Amendment does not forbid "a warrantless arrest for a minor criminal offense, such as a misdemeanor seatbelt violation punishable only by a fine." *Id.* "The temporary detention of individuals during the stop of an automobile, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Wren v. United States*, 517 U.S. 806, 809-10 (1996). At the same time, "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.*

Under Maine law, an operator of a motor vehicle must operate the vehicle "as nearly as practical entirely within a single lane," 29-A M.R.S. § 2051(1), and the operator must not "follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles, the traffic and the condition of the way." 29-A M.R.S. § 2066(1). The general penalty provision of title 29-A appears to apply, namely that these violations are not deemed crimes, but traffic infractions, and are punishable by a fine of not less than $25 nor more than $500. 29-A M.R.S. §§ 103, 104. Maine law gives a law enforcement officer the right to stop a vehicle if the law enforcement officer "has reasonable and articulable suspicion to believe that a violation of law has taken or is taking place." 29-A M.R.S. § 105(1). If the law enforcement officer does not believe that a criminal violation has taken place, the officer still has the authority to stop the vehicle for the purpose of "[i]ssuing the appropriate written process for a...traffic infraction" and "[q]uestioning the operator. . . ." 29-A M.R.S. § 105. The officer has the right to "demand and inspect the driver's license, certificate of registration, [and] . . . permits." 29-A M.R.S. § 105(2). The officer may impound a vehicle if the person operating the vehicle is unable "to produce a certificate of registration . . . or reasonable evidence of authority to operate that vehicle." 29-A M.R.S. § 105(3).

As the Court understands Mr. Beauregard's position, he suggests, though somewhat lightly, that Trooper Forbes did not observe the traffic infractions that justified the initial stop. He brought out that Trooper Forbes had not immediately stopped the Kia after he witnessed the Kia follow another car too closely. He also

notes that the video recording equipment is designed to allow a one-minute retrospective from the moment the trooper hits the record button, but Trooper Forbes did not save the one-minute retrospective recording. Trooper Forbes testified that he was unaware of this feature until this case. Despite Mr. Beauregard's understated skepticism, the Court accepts Trooper Forbes' testimony that he witnessed the operator of the Kia commit two traffic infractions,[4] and the Court concludes that under Maine and federal law, Trooper Forbes was authorized to make a traffic stop of the Kia.[5] *United States v. Tiru-Plaza*, 766 F.3d 111, 119 (1st Cir. 2014) ("We agree with the district court's determination that this traffic infraction was sufficient to justify the initial stop").

### b. Reasonable Suspicion of Drug Trafficking

In addition to the traffic infraction, which separately justified the traffic stop, law enforcement had reasonable suspicion supported by articulable facts to believe that Mr. Beauregard and Ms. Shockley were involved in drug trafficking. Once the police made the stop, the initial *Terry* stop investigation quickly produced

---

[4]    Trooper Forbes' observations that Mr. Beauregard was weaving are consistent with the text message Ms. Shockley sent him, warning Mr. Beauregard that he was swerving.

[5]    Mr. Beauregard's real point may be that in the circumstances of this case, where the officers had been alerted that the Dodge Caravan and Kia were likely carrying illegal drugs from Lawrence to Maine, the trooper's stop of the Kia was a pretext to engage in a search of the operator and the Kia in order to investigate the suspected drug trafficking crime. If pressed, Mr. Beauregard's argument would be commonsensical, because Trooper Forbes and others were clearly lying in wait for the Caravan and Kia as they entered the state of Maine. However persuasive the argument might be outside the bounds of Supreme Court authority, within the confines that this Court operates, it is a nonstarter. In *Whren*, Justice Scalia refused to apply pretext caselaw to a traffic stop that was independently justifiable. 517 U.S. at 811 ("[O]nly an undiscerning reader would regard these cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred"); *United States v. Tanguay*, 918 F.3d 1, 4 (1st Cir. 2019) ("But '[i]n determining whether an officer had reasonable suspicion to justify a *Terry* [*v. Ohio*, 392 U.S. 1 (1968)] stop . . . , the officer's subjective motives do not enter into the decisional calculus") (quoting *United States v. Romain*, 393 F.3d 63, 74 (1st Cir. 2004)).

corroborative evidence that Mr. Beauregard and Ms. Shockley were transporting illegal drugs.

Three searches followed the initial traffic stop of the Kia. The first was a pat-down search of Mr. Beauregard. The second was a search of the Kia, which turned up the crack pipe in the console. The third was a subsequent search of the Kia on November 27, 2018. Mr. Beauregard argues that the first two searches were conducted in violation of the Fourth Amendment, because the officers lacked reasonable articulable suspicion to conduct the searches, and Mr. Beauregard's consent to the search of the Kia was not voluntary. He also contends that the third search must be suppressed as fruit of the poisonous tree.

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that the police may stop and frisk an individual so long as the officer is able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. "A *Terry* stop does not require probable cause so long as the police officer's actions are 'reasonably related in scope to the circumstances which justified the interference,' or are 'reasonably related in scope to the circumstances that . . . develop[] during [the stop].'" *United States v. Tanguay*, 918 F.3d 1, 4 (1st Cir. 2019) (internal citations omitted). The officer's actions subsequent to the initial stop must be:

> [F]airly responsive to the emerging tableau—the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed . . . while an officer's actions must bear some relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention.

*United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001) (citing *U.S. v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998); *Terry,* 392 U.S. at 10).

Under *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), a law enforcement officer may order a driver out of a vehicle once it has been lawfully stopped. *Id.* at 110-11 ("The hazard of accidental injury from passing traffic to an officer standing on the driver's side of the vehicle may also be appreciable in some situations. Rather than conversing while standing exposed to moving traffic, the officer prudently may prefer to ask the driver of the vehicle to step out of the car and off onto the shoulder of the road where the inquiry may be pursued with greater safety to both"); *Tiru-Plaza*, 766 F.3d at 119 ("[I]t is clear that the officers' request that Morales exit the vehicle was permissible").

The Government points to the following factors that supported the officers' *Terry* stop of the Kia:

1) The Caravan with Maine license plates and registered to a Maine resident was being driven in Lawrence, Massachusetts;

2) Lawrence, Massachusetts is known to law enforcement as a source area for controlled substances, particularly heroin and cocaine, being distributed in the state of Maine;

3) Megan Shockley, the owner of the Caravan, lived in the Augusta, Maine area, about 2.5 hours from Lawrence;

4) Law enforcement is aware that drug users and traffickers in Maine often travel to Lawrence to purchase fentanyl and cocaine in bulk quantities at wholesale prices;

5) Ms. Shockley was identified as the operator of the Caravan and had an active arrest warrant in Maine for felony charges of Aggravated Drug Trafficking;

6) Ms. Shockley and the male later identified as Mr. Beauregard traveled to multiple retail stores in the Lawrence area where they could have procured illegal drugs;

7) While driving the Caravan, Ms. Shockley engaged in what the police considered to be countersurveillance maneuvers;

8) After Mr. Beauregard rented the Kia, Ms. Shockley and he drove in tandem northbound on I-495 and I-95 into the state of Maine; and

9) The police recognized in tandem driving to be a tactic in drug trafficking to minimize the risk of being found with controlled substances.

*Gov't's Opp'n* at 13-14. During Special Agent Galbadis' testimony, he elaborated on the countersurveillance tactics that he witnessed in Lawrence. He testified that Ms. Shockley entered onto and immediately exited I-495, a tactic he testified was a way to determine whether they were being followed and to shake any surveillance. He also described the "lead car/trail car" in tandem transportation that Ms. Shockley and Mr. Beauregard engaged in as a common tactic in drug trafficking. Based on this

cumulative evidence, the Court concludes that Trooper Forbes had sufficient articulable facts to warrant the initial *Terry* stop and pat-down.

Trooper Forbes' pat-down of Mr. Beauregard did not produce any direct evidence of drug trafficking. Nevertheless, Mr. Beauregard's responses to some questions contributed to Trooper Forbes' suspicion that he was engaged in drug trafficking. Mr. Beauregard produced a stack of cash from his pocket and gave vague answers about where the cash came from and where he was working in Maine. At this point, when questioned about the rental paperwork, he was unable to produce it, and Trooper Schmidt noticed that Mr. Beauregard became nervous, and was shaking and sweating. Under these facts, the Court finds it reasonable that Troopers Forbes and Schmidt's suspicions were raised, and that they increased the scope of their investigation in response, requesting consent to search the Kia. During the search of the Kia, Trooper Schmidt located a crack pipe in the console.

Moreover, it was not long into the stop of Megan Shockley that she produced illegal drugs and a hypodermic needle, which constituted some additional evidence that she and Mr. Beauregard were involved in drug trafficking. Shortly thereafter, Ibo alerted to two areas of Ms. Shockley's Dodge Caravan and law enforcement discovered 210 grams of fentanyl and 15 grams of crack in the back of the Caravan and a small amount of crack in the make-up kit under the driver's seat.

In light of the cumulative evidence, the Court concludes that the officers had a reasonable and articulable suspicion to stop Mr. Beauregard and to investigate whether he was involved in drug trafficking.

### c.  Voluntary Consent to Search the Kia

Directly following the events above, Trooper Schmidt asked Mr. Beauregard: "Can I look for the paperwork, sir?" Mr. Beauregard replied, "Yeah, go right ahead." Trooper Schmidt then asked: "Mind if I look in the console for paperwork?" Mr. Beauregard replied, "Yeah, go ahead."

Despite his direct acquiescence, Mr. Beauregard argues that his consent was not voluntary. *Def.'s Mot.* at 15-16. He points to what he terms law enforcement's "trickery" by misleading him about the fact that they had stopped Megan Shockley, even after he said that the paperwork from Enterprise might have been sent to his girlfriend's cellphone. *Id.* at 16. Mr. Beauregard quotes *United States v. Forbes*, 181 F.3d 1 (1st Cir. 1999), which directs courts to assess the totality of the circumstances, including the person's "age, education, experience, intelligence, and knowledge of the right to withhold consent." *Id.* (quoting *Forbes*, 181 F.3d at 15).

There is no record evidence of most of these factors as they would apply to Mr. Beauregard. Nevertheless, the Court viewed the videotape of the traffic stop and concludes that Mr. Beauregard was responsive, lucid, and chatty with the officers during the stop. Just before the pat-down, he informed the officers that he had a tool with a blade in his pocket. He described an automobile accident he was involved in the night before in Methuen. The Court's assessment of Mr. Beauregard's age is consistent with the synopsis filed in this case, indicating that he is thirty-seven, a fact that at least suggests he would not be as intimidated by the traffic stop as a teenager or someone in his or her early twenties might be.

It is true that Trooper Schmidt misrepresented whether law enforcement had stopped Megan Shockley. To undercut a defendant's consent, the law enforcement misrepresentation must transform a defendant's voluntary consent into involuntary consent. In the words of the First Circuit, "so long as the manipulative behavior does not cause us to question whether the relinquishment was in fact voluntary (e.g., an abuse of office such as the actual or threatened use of force), it is 'reasonable' within the meaning of the Fourth Amendment." *United States v. Hornbecker*, 316 F.3d 40, 49 (1st Cir. 2003). In fact, the First Circuit has written that "law enforcement is permitted to engage in basic 'manipulative behavior,' such as 'insincere friendliness which successfully induces a criminal suspect to willingly answer questions and/or consent to a search,' so long as it does not impact the defendant's voluntary relinquishment of a right." *United States v. Smith*, 919 F.3d 1, 14 (1st Cir. 2019) (quoting *Hornbecker*, 316 F.3d at 49). Indeed, "some degree of deception [by law enforcement] during the questioning of a suspect is permissible." *United States v. Hughes*, 640 F.3d 428, 439 (1st Cir. 2011).

Here, the Court finds that Mr. Beauregard's consent to the search of the Kia was not affected by Trooper Schmidt's misrepresentation about Megan Shockley's traffic stop. Mr. Beauregard told the officers that Enterprise emailed the rental agreement to Ms. Shockley. If that were true, regardless of whether Ms. Shockley was stopped or not, Mr. Beauregard would have known that Trooper Schmidt would not find the rental agreement in the Kia or in the Kia console. Yet, he told Trooper Schmidt that he could look in the Kia and in its console to find the rental agreement.

The Court concludes that Trooper Schmidt's misrepresentation about Ms. Shockley's whereabouts is unrelated to his consent to search the Kia and its console.

In sum, the Court finds that Mr. Beauregard consented to Trooper Schmidt's search of the Kia that produced the crack pipe in the console. The crack pipe is further evidence that Mr. Beauregard was engaged in drug trafficking given his contradictory responses about his ownership and use of the pipe.

### d.    Duration of the Stop

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015). In *Tiru-Plaza*, the First Circuit discussed the appropriate length of a *Terry* stop, writing that "[t]he appropriate length of *Terry* stop is gauged by whether the officer diligently pursued a reasonable investigative approach calculated to ensure officer safety and, at the same time, confirm or dispel his suspicions." 766 F.3d at 117 (quoting *United States v. Pontoo*, 666 F.3d 10, 31 (1st Cir. 2011)). Here, regardless of whether the initial stop is viewed as purely a stop for the traffic infractions or a stop to investigate a possible drug trafficking crime, the detention of the Kia does not in the Court's view violate the Constitution's prohibition against unreasonable searches and seizures. Far from dispelling the officers' collectively-held reasonable suspicion about Mr. Beauregard and Ms. Shockley's drug trafficking, each additional piece of evidence secured during the delay corroborated the officers' drug trafficking investigation. *See Chhien*, 266 F.3d at 6; *Terry,* 392 U.S. 1 at 10. After the police arrested Mr.

Beauregard, the Kia, which he did not own, was removed from the breakdown lane of the Maine Turnpike to a parking lot for safety. On November 27, 2018, when the police searched the Kia again, they did so with the owner's permission and Mr. Beauregard makes no separate argument, other than a fruit of the poisonous tree contention, against the legality of the November 27, 2018 search.

### e. Mr. Beauregard's Statements

In his motion, Mr. Beauregard contends that any statements he made during the stop were obtained in violation of *Miranda*, because he was in custody and was not provided *Miranda* rights. *Def.'s Mot.* at 22-23. Although he raised this issue in his written motion, Mr. Beauregard did not press it at the evidentiary hearing and the Court is not clear whether he is now pressing the *Miranda* issue. It is addressing the issue in excess of caution.

The Government maintains that it only seeks to admit at trial the statements Mr. Beauregard made prior to the point at which he was confronted with the fact that a crack pipe was found in his car. *Gov't's Opp'n* at 19. It contends that at this point in the traffic stop, Mr. Beauregard was not handcuffed and had had not been detained or told he was under arrest, and that, as evidenced in the video, he was gesturing and was free to move around at the scene. This evidence, the Government argues, shows a non-custodial interrogation.

The procedural safeguards of *Miranda* apply "only where there has been a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations omitted). To determine whether an

individual was in custody, courts analyze the totality of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (citations omitted). The Supreme Court held in *Berkemer v. McCarty* that "[t]he comparatively noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." 468 U.S. 420, 440 (1984).

Trooper Schmidt testified that Mr. Beauregard was not read his *Miranda* rights during the traffic stop. The video supports the Government's position that Mr. Beauregard was not in custody during the officers' questioning before they found the crack pipe. Mr. Beauregard has offered no evidence and put forth no argument to demonstrate why the interrogation was custodial in nature such that this Court should deviate from the Supreme Court's holding in *Berkemer*. The Court concludes that, as there is no evidence of a *Miranda* violation, the statements are admissible.

## IV. CONCLUSION

Having concluded that the stop of Mr. Beauregard was lawful either as a stop pursuant to traffic infractions the trooper witnessed or as a stop pursuant to drug trafficking investigation based on reasonable suspicion, the Court concludes that Mr. Beauregard did not have a cognizable Fourth Amendment claim in the personal items law enforcement found in Megan Shockley's Caravan, that Mr. Beauregard knowingly and voluntarily consented to a search of the rented Kia, which turned up

the crack pipe, that law enforcement's detention of Mr. Beauregard was not unconstitutionally delayed, and that Mr. Beauregard's statements to the police before they found the crack pipe in the Kia were non-custodial and therefore not subject to *Miranda* warnings. The Court DENIES Richard Beauregard's Motion to Suppress (ECF No. 34).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 26th day of June, 2019