UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA     )
                             )
        v.                   )        No. 2:18-cr-00192-JAW
                             )
RICHARD BEAUREGARD           )


**ORDER ON MOTION FOR COMPASSIONATE RELEASE**

An inmate serving a thirty-six-month sentence for conspiracy to distribute and possess with intent to distribute forty grams or more of fentanyl moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). The Court concludes that the inmate has failed to carry his burden of proving extraordinary and compelling reasons warranting release, and the seriousness of his offense, his conduct while on pretrial release, and the need for the sentence served to fulfill the sentence imposed preclude his release. The Court dismisses the motion without prejudice.

## I.     PROCEDURAL BACKGROUND

On November 21, 2019, Richard Beauregard pleaded guilty to conspiracy to distribute and possess with intent to distribute forty grams or more of a mixture or substance containing fentanyl in violation of 21 U.S.C. §§ 846 and 841(a)(1). *Min. Entry* (ECF No. 73). On October 6, 2020, the Court sentenced Mr. Beauregard to thirty-six months of imprisonment, four years of supervised release, and a $100 special assessment. *Min. Entry* (ECF No. 92); *J.* (ECF No. 93).

On March 23, 2021, Mr. Beauregard filed a motion for compassionate release. *Def. Richard Beauregard's Mot. for Compassionate Release/or Alternatively, Modify His Sentence to Home Confinement* (ECF No. 107) (*Def.'s Mot.*). On April 2, 2021, the

Government responded in opposition. *Gov't's Obj. to Def.'s Mot. for Compassionate Release* (ECF No. 111) (*Gov't's Opp'n*). Three days later, the Government filed an amended opposition. *Gov't's Am. Obj. to Def.'s Mot. for Compassionate Release* (ECF No. 112) (*Gov't's Am. Opp'n*). Mr. Beauregard replied on April 6, 2021. *Def. Richard Beauregard's Resp. to the Gov't's Obj. to His Mot. for Compassionate Release/or Alternatively, Home Confinement* (ECF No. 113) (*Def.'s Reply*).

## II.   FACTUAL BACKGROUND

The Court draws much of this factual background from Mr. Beauregard's Presentence Investigation Report (PSR). *Restricted U.S. Probation Filing*, Attach. 3, *PSR* (ECF No. 98). The Court adopted the PSR without change and relied on it to sentence Mr. Beauregard. *Statement of Reasons* at 1 (ECF No. 94).

### A.   Criminal History

Mr. Beauregard's criminal history consists of one adult criminal conviction. Salem, New Hampshire Police Department records reflect that on December 10, 2009, Mr. Beauregard was observed slumped over and sleeping in a parked vehicle. *PSR* ¶ 30. The ignition was on and he was sitting in the driver's seat. *Id.* The police had a difficult time waking him, and when he finally did wake up, police observed his eyes were red and bloodshot and his speech was slurred. *Id.* Police asked Mr. Beauregard to complete multiple field sobriety tests, which he failed. *Id.* Police then arrested Mr. Beauregard. *Id.* An inventory search of the vehicle revealed one-half of a suboxone pill, one Xanax pill, ten lorazepam pills, and five tramadol pills. *Id.* According to the report, Mr. Beauregard had no prescriptions for any of the pills and

they were packaged for illicit use. *Id.* On March 3, 2010, Mr. Beauregard was sentenced by the Salem, New Hampshire District Court to sixty days' imprisonment, suspended for two years upon good behavior, revocation of his driver's license for nine months, a $500 fine, and a $120 penalty assessment for possession of a controlled drug and driving under the influence. *Id.*[1]

The Probation Office (PO) calculated a criminal history score of one, placing Mr. Beauregard in Criminal History Category I, *id.* ¶ 31, and at the sentencing hearing, the Court concluded that Mr. Beauregard was a Criminal History Category I. *Statement of Reasons*, Attach. 1, *Findings Affecting Sentencing* ¶ 4.

### B.   Offense Conduct

The investigation into Mr. Beauregard's offense conduct was conducted by the U.S. Drug Enforcement Administration (DEA), Maine State Police (MSP), and York Police Department (YPD). *PSR* ¶ 8. On November 7, 2018, DEA agents observed a vehicle driven by Meghan Shockley—a woman with an active arrest warrant from Kennebec County, Maine for aggravated trafficking in scheduled drugs—make stops at multiple locations in Lawrence, Massachusetts. *Id.* While surveilling the van, agents observed Ms. Shockley drop off a male passenger, later identified as Mr. Beauregard, at an Enterprise Rent-A-Car (Enterprise) location in Lawrence. *Id.* DEA agents observed Mr. Beauregard drive away from Enterprise in a rented vehicle.

---

[1]   The PSR reflects that Mr. Beauregard was also arrested three times between 2014 and 2018 for charges including heroin possession, breaking and entering, and aggravated trafficking of scheduled drugs. *PSR* ¶¶ 32-34. He was also arrested in 1999 for shoplifting. *Id.* ¶ 36. Because these charges were either dismissed or annulled, the Court does not consider them in its compassionate release analysis. *See United States v. Marrero-Pérez*, 914 F.3d 20, 22 (1st Cir. 2019) (concluding a sentencing court should give no weight "to arrests not buttressed by convictions or independent proof of conduct").

*Id.* The agents followed Ms. Shockley and Mr. Beauregard as they traveled in tandem from Lawrence, Massachusetts to Maine. *Id.* ¶ 9. DEA agents coordinated with the MSP to stop both vehicles on I-95 in Maine. *Id.*

Ms. Shockley was stopped by the MSP, removed from her vehicle, and taken into custody on the outstanding arrest warrant. *Id.* ¶ 10. A search incident to arrest resulted in the seizure of a small amount of suspected heroin, suspected crack cocaine, and a hypodermic needle in Ms. Shockley's bra. *Id.* A drug-detecting police dog alerted the MSP to the presence of drugs in the vehicle and a search resulted in the seizure of twenty-one "fingers" (a wholesale packaging method) containing approximately two hundred ten grams of suspected fentanyl and two bags of suspected cocaine base, weighing approximately fifteen grams. *Id.* The drugs were located in the rear of the vehicle among male clothing, which according to Ms. Shockley belonged to "Rick." *Id.* Ms. Shockley did not know Rick's last name, but she identified him as someone she picked up in Lawrence, Massachusetts and drove to the car rental agency. *Id.* Laboratory testing revealed the seized packages contained 216.4 grams of fentanyl. *Id.*

MSP stopped Mr. Beauregard and identified him using his Massachusetts driver's license. *Id.* ¶ 11. When he attempted to produce his license, he removed a "wad" of cash from his pocket, later determined to be $1,340 cash. *Id.* Mr. Beauregard allowed the trooper to look in the vehicle for the rental car agreement and upon doing so, the trooper observed a suspected crack pipe between the center

4

console and front passenger seat. *Id.* Mr. Beauregard initially disclaimed ownership of the pipe but later acknowledged it was his and contained "crack." *Id.*

On November 28, 2018, Enterprise contacted the YPD upon observing suspected drug-related items in the car as it was being prepared for rental. *Id.* ¶ 12. The YPD responded and collected additional items from the car, including Mr. Beauregard's driver's license and a glass pipe with residue. *Id.* The YPD also found a pill bottle between the passenger seat and middle console containing 5.3 grams of suspected fentanyl and 5.004 grams of cocaine base. *Id.*

The investigation recovered text messages between Mr. Beauregard and another individual revealing that in the two days preceding the traffic stops, they discussed Mr. Beauregard ordering "fingers" and "crack." *Id.* ¶ 13. Mr. Beauregard offered the source one pound of marijuana in exchange for the drugs, which the source declined. *Id.* The "fingers" were negotiated for purchase at approximately $260 per "finger." *Id.*

With respect to drug quantity, the PO concluded that Mr. Beauregard was responsible for 221.7 grams of fentanyl and 20.004 grams of cocaine base, totaling 625.68 kilograms of converted drug weight. *Id.* ¶ 14.

### C.   Guideline Calculations

As a result of his criminal history and offense conduct, the Court determined that Mr. Beauregard was a Criminal History Category I with a Total Offense Level of 24. *Statement of Reasons* at 1. The applicable sentencing guideline range was fifty-one months to sixty-three months of imprisonment, two to five years of supervised

release, and a fine between $20,000 and $5,000,000. *Id.* The Court imposed a downward variant sentence of thirty-six months of incarceration, four years of supervised release, and a $100 special assessment. *Id.* at 2; *J.* at 2-7.

## III.   THE PARTIES' POSITIONS

### A.   Richard Beauregard's Motion

Mr. Beauregard requests the Court "grant compassionate release or alternatively, modify his sentence to home confinement" pursuant to 18 U.S.C. § 3582(c). *Def.'s Mot.* at 1. He first asserts a statement of uncontested facts and claims he fully exhausted his administrative remedies when the Warden of FMC Devens denied his request for compassionate release. *Id.* at 2-7. He next turns to the merits.

Mr. Beauregard argues that he should be released "due to his health conditions and the risk of complications from COVID-19." *Id.* at 8. He asserts three medical conditions that he claims put him at higher risk from COVID-19: obesity, hypertension, and endocarditis. *Id.* at 9-11. He also complains of "anxiety, depression, chronic pain . . . and lumbar and spine injuries." *Id.* at 2. He contends that he is "particularly vulnerable in the prison setting" and claims that "COVID-19 case rates have been substantially higher and escalated much more rapidly in prisons than in the general United States population." *Id.* at 11-13. He admits he has been vaccinated and vaccinations are "a positive factor for the Court to consider," but contends that "vaccinations are not a basis to deny compassionate release." *Id.* at 18. He claims it is "unclear how variants of COVID-19 impact their effectiveness" and "a

6

major concern is the [lightning] speed that a variant form of the virus that cannot be controlled by the various vaccinations could make its way through the prison system." *Id.* at 18-19.

Regardless of whether his medical issues meet the extraordinary and compelling standard, Mr. Beauregard argues that "the COVID-19 pandemic itself and the resulting impact in prisons meets that criteria." *Id.* at 14. Specifically, he asserts that his "sentence has been more severe than intended" because he has been unable to participate in any substance abuse programs while incarcerated. *Id.* at 15-16. Furthermore, he claims to have been subject to "lengthy lockdowns, isolation, and infrequent showers," among other restrictions. *Id.* at 16. Finally, he argues that he "lives in constant pain due to his various injuries while BOP has been unable, unwilling, or reluctant to seek measures to alleviate it" and states he "has seen the doctor once since he has been at FMC Devens and was not seen by a specialist until March 15, 2021." *Id.* at 17, 17 n.6.

Mr. Beauregard next argues the 18 U.S.C. § 3142(g) factors favor his release. *Id.* at 20. He admits that his drug conviction "weigh[s] against release" but points to a "multitude of factors" that favor release. *Id.* at 21. In particular, he notes that he has "little prior criminal history," "no real history of violence," "viable placement options if he is released," and he has been a "model prisoner." *Id.* Moreover, he states that any concerns are "alleviated by the fact that he will be on intense supervision upon his release and he has an incentive to stay out of prison." *Id.* If released, he asserts he has "several options for a viable release plan," including "the sober living

program at 51 Myrtle Street in Portland, Maine," and the Granite State Recovery Center and Green Mountain Treatment Center in New Hampshire. *Id.* at 26-27. He argues in the alternative that the Court should modify his sentence to home confinement, where he could reside with his wife and her children in Lebanon, Maine. *Id.* at 23-26, 28.

### B.     The Government's Opposition

The Government opposes Mr. Beauregard's request, arguing that he has failed to show extraordinary and compelling reasons warranting release and further that the 18 U.S.C. § 3553(a) factors weigh against his release. *Gov't Am. Opp'n* at 1-2. The Government first provides background, noting that Mr. Beauregard was released on pretrial bail in 2019 but his bail was revoked after he left his residence without permission and crashed his vehicle on I-95 in New Hampshire, striking a tree and rolling the vehicle, and seriously injuring himself in the process. *Id.* at 2. The hospital measured his blood alcohol content as between 0.12% and 0.19%. *Id.* He was also disciplined within ten days of his pretrial confinement at Strafford County Jail after he was witnessed "placing his knee on another inmate's neck while the inmate was laying down." *Id.* at 3. The Government next recounts the BOP's response to the COVID-19 pandemic, claiming that while FMC Devens experienced an outbreak, it now reports zero infections among inmates and staff. *Id.* at 4-7.

Turning to the merits, the Government argues that Mr. Beauregard "receives adequate medical care while incarcerated and his risk of contracting COVID-19 or suffering severe illness has been mitigated by vaccination." *Id.* at 10. The

Government concedes that Mr. Beauregard "has one or more medical conditions that may have previously constituted an 'extraordinary and compelling' circumstance rendering him potentially eligible for compassionate release," but there are "several countervailing factors that also must also be taken into consideration." *Id.* at 11. First, he is fully vaccinated and while new variants have emerged, the Moderna vaccine "remains equally effective against many of the new variants." *Id.* Second, he is getting adequate medical care. *Id.* at 12-13. Third, some of his health conditions "appear to be the result of drug and alcohol abuse, and any potential health benefit of release should be weighed against the health risks associated with relapse." *Id.* at 13.

The Government next addresses Mr. Beauregard's remaining arguments. The Government states that inmates in his unit "currently have access to a variety of programming and services" and "though inmates have certainly suffered hardships as a result of the COVID-19 virus, these hardships should not serve as a reason to afford compassionate release to every inmate and should be reserved for instances where truly extraordinary and compelling reasons are present." *Id.* at 14. The Government contends the lack of drug treatment programs should not serve as a basis for compassionate release because Mr. Beauregard is on a waitlist for the residential drug treatment program and he will be referred for ninety days in a residential reentry center prior to his projected release date. *Id.*

Finally, the Government argues that 18 U.S.C. § 3142(g) and § 3553(a) weigh against release. *Id.* at 15. The Government asserts that Mr. Beauregard "poses a

risk of danger to the community based on the possibility that he resumes using drugs and the risk that continued drug use will lead to other offenses like the offense of conviction." *Id.* Furthermore, the Government contends that his offense conduct— distribution of a significant quantity of fentanyl—as well as the need to protect the public, afford adequate deterrence, and reflect the seriousness of the offense, promote respect for the law, and provide just punishment all favor him serving the remainder of his sentence. *Id.* at 15-18.

### C.    Richard Beauregard's Reply

Mr. Beauregard raises three arguments in his reply to the Government's opposition. First, he claims that while the Government argues that the BOP has taken aggressive measures to mitigate the spread of infection, "the uncontroverted facts are that the prison settings have a significantly higher infection and death rate than the general population." *Def.'s Reply* at 3. He further argues that "it is simply too premature to suggest that the vaccinations have mitigated the significant risks posed to those with high risk factors." *Id.* at 5. Second, he repeats his argument that he "has not been able to receive any substance abuse education programming." *Id.* at 5-6. Third, he "certainly concedes that his drug conviction was serious," but argues that "it is not indicative of an inherent danger to the public suggestive of the inability for the court to look at extraneous factors during his rehabilitation." *Id.* at 7. Furthermore, any danger "is mitigated by the ability for the court to order stringent release conditions including home confinement." *Id.* at 8.

## IV.   LEGAL STANDARD

The Court has addressed the legal standard for deciding a motion for compassionate release on numerous occasions.  *See, e.g., United States v. Crosby*, No. 1:17-cr-00123-JAW-01, 2020 U.S. Dist. LEXIS 199085, at *16-23 (D. Me. Oct. 27, 2020).  Put succinctly, 18 U.S.C. § 3582(c)(1)(A)(i) permits a court to modify a term of imprisonment when (1) "extraordinary and compelling reasons warrant" the movant's release, (2) release is consistent with "the factors set forth in [18 U.S.C. §] 3553(a)", and (3) release comports with "applicable policy statements issued by the Sentencing Commission . . .."  18 U.S.C. § 3582(c)(1)(A).[2]

The movant bears the burden of proving that he is entitled to a sentence reduction, and "the Court has broad discretion in deciding whether to grant or deny a motion for sentence reduction."  *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, 473 F. Supp. 3d 14, 16 (D.N.H. 2020) (internal citations omitted)).

---

[2]      The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions brought by the Director of the Bureau of Prisons under § 3582(c)(1)(A).  However, "[t]he Sentencing Commission promulgated this policy statement before the emergence of the COVID-19 pandemic and before the changes to § 3582 put in place by the FIRST STEP Act."  *Crosby*, 2020 U.S. Dist. LEXIS 199085, at *20 n.1.  This Court agrees with the vast majority of courts that have held § 1B1.13 "'provides helpful guidance' but 'is not ultimately conclusive given the statutory change.'"  *United States v. Rembert*, No. 2:12-CR-66-DBH, 2020 U.S. Dist. LEXIS 210841, at *1 (D. Me. Nov. 11, 2020) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 U.S. Dist. LEXIS 115388, at *5 (D. Me. July 11, 2019), *aff'd*, No. 19-1785 (1st Cir. July 23, 2020)); *see United States v. Trenkler*, Cr. No. 92-10369 WES, 2021 U.S. Dist. LEXIS 87567, at *16 (D. Mass. May 6, 2021) (collecting cases).

## V.     DISCUSSION[3]

The Court has reviewed Mr. Beauregard's motion along with the Government's response and the applicable law.  The Court finds that Mr. Beauregard's medical conditions may place him at higher risk from COVID-19, but in light of his recent vaccination and the ongoing vaccination of others at FMC Devens, Mr. Beauregard has failed to carry his burden of showing extraordinary and compelling reasons warranting his release.  Additionally, the Court concludes that the nature of Mr. Beauregard's offense, his conduct while on pretrial release, and the need for the sentence imposed to deter him and others similarly situated tip the scales against release.

### A.     Extraordinary and Compelling Reasons

To grant Mr. Beauregard's motion under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find "extraordinary and compelling reasons warrant[ing]" a reduction in sentence.  Mr. Beauregard contends he should be released because his medical conditions place him at a higher risk from COVID-19, he has severe back pain, and he has suffered additional punishment by being subject to strict lockdown and quarantine measures in prison.

---

[3]     18 U.S.C. § 3582(c)(1)(A) contains a mandatory claim processing rule, which bars some compassionate release motions as untimely.  *See Crosby*, 2020 U.S. Dist. LEXIS 199085, at *17 (citing *United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, at *3 (D. Me. Apr. 10, 2020)).  On February 25, 2021, the warden at FMC Devens denied Mr. Beauregard's request for compassionate release.  *Def.'s Mot.*, Attach. 3, *FMC Devens Compassionate Release Notification Form*.  The Government "concedes that [Mr. Beauregard] has exhausted his administrative remedy by submitting a request for reduction in sentence to the warden and receiving denial."  *Gov't's Am. Opp'n* at 4 n.1.  The Court agrees.

According to the Centers for Disease Control and Prevention (CDC), there are several factors that increase a person's risk of severe illness from COVID-19. Arguably, the most decisive factor is a person's age. *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited May 24, 2021). Generally, the risk of COVID-19 increases as a person ages, and over eighty percent of deaths occur in people who are sixty-five or older. *Id.* The age-related risk does not disappear when someone is younger than sixty-five. *See id.* (Table entitled "Risk for COVID-19 Infection, Hospitalization, and Death By Age Group"). Thus, even though at age forty Mr. Beauregard is not in the highest risk group, he is more likely than someone younger to require hospitalization or suffer other serious complications, including death, from COVID-19.

People with certain medical conditions may be at high risk of getting seriously ill if they contract COVID-19. The CDC guidelines list a number of medical conditions that "can make [a person] more likely to get severely ill from COVID-19." *People with Certain Med. Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited May 24, 2021) (*CDC COVID Med. Conditions*). By contrast, the CDC lists only one condition, pregnancy, that it says is—as opposed to can be—more likely to make a person severely ill from COVID-19. *Id.* The Court assesses Mr. Beauregard's underlying medical conditions against the most recent CDC guidance.

Mr. Beauregard asserts three medical conditions that he claims put him at significant risk from COVID-19: (1) obesity, (2) hypertension, and (3) endocarditis.

13

*Def.'s Mot.* at 9-11.  Mr. Beauregard's most recent medical records provide evidence of each of these conditions.  *Id.*, Attach. 1, *BOP Health Services, Clinical Encounter* at 3, 127-28 (*BOP Health Records*).  Thus, the Court accepts that Mr. Beauregard does, in fact, suffer from those conditions.

According to the CDC, being overweight or obese can make it more likely that a person will get severely ill from COVID-19.  *CDC COVID Med. Conditions*.  The CDC notes that the "risk of severe COVID-19 illness increases sharply with elevated BMI."  *Id.*  The CDC defines "obesity" as a body mass index (BMI) of more than 30 and less than 40 kg/m$^2$ and "severe obesity" as a BMI of more than 40 kg/m$^2$.  *Id.*  The CDC defines "overweight" as a BMI more than 25 and less than 30 kg/m$^2$.  *Id.*  BOP records show that on March 12, 2021, Mr. Beauregard weighed 259 pounds, and on December 30, 2020, he measured 5 feet 9 inches tall.  *BOP Health Records* at 103.  By the Court's calculation, Mr. Beauregard has a BMI of 38.2 kg/m$^2$.[4]  Thus, the Court accepts that Mr. Beauregard is obese and therefore may be more likely to get severely ill from COVID-19.

Mr. Beauregard next complains of hypertension.  According to the CDC, people with heart conditions can be more likely to get severely ill from COVID-19.  *CDC COVID Med. Conditions.*  However, specifically for hypertension, the CDC says that high blood pressure is "possibly" a condition that "can" make a person more likely to

---

[4]    In his brief, Mr. Beauregard contends that he has a BMI of 36.1 with a weight of 259 pounds and height of 5 feet 11 inches as of March 12, 2021.  However, his medical records show he is sixty-nine inches, or 5 feet 9 inches tall, and thus his BMI is actually higher than what he claims.

get severely ill from COVID-19.  From the Court's reading, the CDC compounds possibilities for hypertension, lessening its risk factor.

Finally, Mr. Beauregard has "endocarditis," which he describes as "an inflammation of the heart's inner lining, generally caused by bacteria." *Def.'s Mot.* at 4.  The CDC advises that "heart conditions (such as heart failure, coronary artery disease, cardiomyopathies or hypertension)" "can make you more likely" to get severely ill from COVID-19.  *CDC COVID Med. Conditions*.  However, neither the CDC nor the Harvard Medical School article Mr. Beauregard cites clarifies whether endocarditis can increase a person's risk from COVID-19.  *See Def.'s Mot.* at 4 (citing *COVID-19 and the heart: What have we learned?*, HARVARD HEALTH PUBLISHING (Jan. 6, 2021), https://www.health.harvard.edu/blog/covid-19-and-the-heart-what-have-we-learned-2021010621603.  Moreover, Mr. Beauregard's medical records indicate that his endocarditis is in remission.  *See BOP Health Records* at 64, 98, 128. Without further information, the Court cannot assess to what degree Mr. Beauregard's endocarditis increases his risk from COVID-19.

The Government "acknowledges that [Mr. Beauregard] has one or more medical conditions that may have previously constituted an 'extraordinary and compelling' circumstance rendering him potentially eligible for compassionate release," but argues that the risks from COVID-19 have been sufficiently mitigated. *Gov't's Am. Opp'n* at 11.  The Court agrees.

Mr. Beauregard's risk of contracting COVID-19 is reduced because of the ongoing vaccination program and low infection rate at FMC Devens.  The BOP

website describes FMC Devens as an "administrative security federal medical center with an adjacent minimum security satellite camp." *FMC Devens*, BOP, https://www.bop.gov/locations/institutions/dev/ (last visited May 24, 2021). There are 726 total inmates, with 671 at the FMC and 55 at the Camp. *Id.* According to the BOP, it has fully inoculated 348 staff members and 478 inmates at FMC Devens. *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited May 24, 2021). The latest COVID-19 statistics from FMC Devens are also encouraging. The BOP website lists one inmate and no staff members as having tested positive for COVID-19. *Id.* Eleven inmates have died, and 374 inmates and 63 staff have recovered. *Id.* While the facility may have experienced a COVID-19 outbreak in the past, the current statistics show only one positive inmate.

Mr. Beauregard's risk of serious illness from COVID-19 is further reduced significantly by his vaccination. BOP records show that Mr. Beauregard received the first dose of the Moderna vaccine on February 12, 2021 and the second dose on March 22, 2021. *Gov't's Am. Opp'n*, Attach. 4, *BOP Health Services, Immunizations* at 1. According to the CDC, as of April 5, 2021, Mr. Beauregard was fully vaccinated—two weeks after his second dose. *When You've Been Fully Vaccinated*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html (last visited May 24, 2021) (*CDC Vaccine Information*).

Notwithstanding Mr. Beauregard's concerns about COVID-19 variants, COVID-19 vaccines have proven to be extremely effective. In particular, the Moderna vaccine is proven to be "94.1% effective at preventing laboratory-confirmed COVID-19

illness in people who received two doses who had no evidence of being previously infected." *Moderna COVID-19 Vaccine Overview and Safety*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Moderna.html (last visited May 24, 2021). While the vaccines are not one hundred percent effective, the CDC unequivocally says, "COVID-19 vaccines are effective at preventing COVID-19 disease, especially severe illness and death." *CDC Vaccine Information*. This Court has repeatedly found that vaccinations greatly reduce an inmate's risk from COVID-19. *See United States v. Nygren*, No. 1:16-cr-00106-JAW, 2021 U.S. Dist. LEXIS 91572, at *21-23 (D. Me. May 13, 2021); *United States v. Akerson*, No. 1:16-cr-00130-JAW-1, 2021 U.S. Dist. LEXIS 88842, at *25-27 (D. Me. May 10, 2021); *United States v. French*, No. 1:12-cr-00160-JAW-1, 2021 U.S. Dist. LEXIS 87013, at *43-45 (D. Me. May 6, 2021). In light of his vaccination and the ongoing vaccination of others at FMC Devens, the Court concludes Mr. Beauregard failed to carry his burden of proving the threat from COVID-19 is an extraordinary and compelling reason warranting release.

In addition to his risk from COVID-19, Mr. Beauregard describes "chronic pain" and "lumbar and spine injuries" stemming from his 2019 car crash and argues that he is deserving of compassionate release because he "lives in constant pain due to various injuries while BOP has been unable, unwilling, or reluctant to seek measures to alleviate it." *Def.'s Mot.* at 2, 17. Rather than being unwilling or unable to treat him, however, his BOP medical records reflect attentive medical support including regular clinical encounters and a treatment plan consisting of physical

17

therapy and medication. *BOP Health Records* at 1-84, 140-44. FMC Devens granted his request to transfer from the FMC Devens Camp to a unit where he felt he would have greater access to physical therapy and medication. *Id.* at 13, 44, 66, 99. Mr. Beauregard has the burden of proving extraordinary and compelling reasons warranting release, and without further information regarding Mr. Beauregard's back problems and the BOP's inability to care for him, the Court cannot conclude such reasons exist.

Finally, Mr. Beauregard argues that even if this Court finds his medical issues are not extraordinary and compelling circumstances, "the COVID-19 pandemic itself and the resulting impact in prisons meets that criteria." *Def.'s Mot.* at 15-16. He argues that he has not been able to participate in substance abuse treatment programs and he has been subject to "draconian" quarantine policies. *Id.*

The Court is not convinced that these concerns warrant compassionate release. The BOP responded to the COVID-19 pandemic by consulting with the CDC and implementing policies designed to prevent the spread of COVID-19 within its facilities. Unfortunately, these measures have resulted in the elimination of certain programs, as well as lockdowns and quarantines. However, every inmate has been subjected to the BOP's COVID-19 policies and Mr. Beauregard has not shown why the Court should grant compassionate release to him in particular. *See United States v. Colburn*, Criminal Action No. 19-10080-NMG, 2021 U.S. Dist. LEXIS 13762, at *2 (D. Mass. Jan. 26, 2021) ("Every prisoner in a BOP facility is currently subjected to onerous conditions due to the COVID-19 pandemic and [defendant] has not explained

18

why he should be given special or unique treatment") (internal quotation marks and citation omitted). Without more, the Court cannot find extraordinary and compelling reasons exist to warrant Mr. Beauregard's release.

### B.    The Section 3553(a) Factors

Notwithstanding the Court's finding regarding any extraordinary and compelling reasons for Mr. Beauregard's release, the Court concludes the 18 U.S.C. § 3553(a) factors weigh against release. The Court primarily rests this finding on three considerations. First, Mr. Beauregard's offense of conviction. Mr. Beauregard's offense involved trafficking large amounts of fentanyl and cocaine from out of state. This is a serious offense, and fentanyl in particular is an extremely dangerous drug. *See United States v. Martinez*, No. 2:18-cr-89-DBH, 2020 U.S. Dist. LEXIS 180635, at *3 (D. Me. Sept. 30, 2020) (concluding defendant posed a danger to the community and observing "fentanyl is a killer. It's a very dangerous drug. It's having a huge impact on Maine and around the country. It's a very dangerous drug to distribute and then for people to use").

Second, the Court is concerned by Mr. Beauregard's conduct while on pretrial release. On January 25, 2019, he was released on conditions which included requirements to abstain from illegal drugs and to be placed on home detention. *PSR* ¶ 7; *Order Setting Conditions of Release* (ECF No. 27). He proceeded to repeatedly violate those conditions. First, on July 29, 2019, he submitted to a random drug test and tested positive for marijuana, which he admitted to using. *PSR* ¶ 7. Next, on August 4, 2019, he left his residence without permission and did not return

19

home.  *Id.*  His wife reported that they fought about his smoking cocaine base or methamphetamine, and that evening he took her vehicle without permission.  *Id.*  Later that night, he lost control of the vehicle on I-95 in Seabrook, New Hampshire, striking a tree and rolling the vehicle.  *Id.*  Witnesses reported smelling the odor of alcohol during attempts to render aid after he was ejected from the vehicle, and the hospital reported his blood alcohol content as approximately 0.12-0.19%. *Id.* ¶¶ 7, 44. He was seriously injured as a result of this accident and continues to suffer back pain. *Id.* ¶ 44.  Due to these incidents, this Court ordered him detained pending trial, finding "by clear and convincing evidence that there are no conditions or combination of conditions that will reasonably assure the appearance or the safety of any other person and the community." *Order of Detention Pending Trial* (ECF No. 61).

Moreover, despite claiming he has "no real history of violence," discipline records from the Strafford County Jail in Dover, New Hampshire reflect that on September 8, 2019, while in the medical unit, he was witnessed placing his knee on another inmate's neck while the inmate was lying down.  *PSR* ¶ 7.  He claimed he assaulted the inmate because the inmate was "annoying and won't shut up."  *Id.*  As a result, he was disciplined with ten days in confinement.  *Id.*

Third, the sentence must afford adequate deterrence.  This includes both specific deterrence—that is, the need for Mr. Beauregard to serve a sentence long enough to deter his own criminal conduct—as well as general deterrence, the need to deter others.  Particularly in instances like this, where the defendant is involved in a drug trafficking conspiracy, a substantial sentence is necessary to reflect the

seriousness of the offense and to prevent others from engaging in similar criminal conduct.

In sentencing Mr. Beauregard, the Court imposed a variant sentence of thirty-six months, below the guideline range of fifty-one to sixty-three months of imprisonment. *Statement of Reasons* at 2. The Court reasoned that this sentence was "sufficient but no greater than necessary." The Court reviewed its prior determination and reaffirms it in full. The Court received no new information that would alter its reasoning at the time of his sentencing hearing. Early release would fail to reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence.

### C.   Summary

Mr. Beauregard has not carried his burden of proving entitlement to compassionate release. While obesity and to a lesser extent hypertension can increase the risk of serious complications from COVID-19, he is now vaccinated and so his risk of serious illness from COVID-19 is substantially reduced. Furthermore, given the nature of his offense and his conduct on pretrial release, releasing Mr. Beauregard early would endanger the community and contravene the § 3553(a) factors. The Court wishes Mr. Beauregard the best and fully expects that he will return to society a productive and law-abiding citizen. On the record before the Court, however, he does not qualify for compassionate release under 18 U.S.C. § 3582(c).

## VI.   CONCLUSION

The Court DISMISSES without prejudice Richard Beauregard's Motion for Compassionate Release/or Alternatively, Modify His Sentence to Home Confinement (ECF No. 107).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 24th day of May, 2021